# EXHIBIT 1

Written Testimony of:
Jacob Sims

Visiting Fellow, Asia Center, Harvard University
Sr. Advisor on Transnational Crime and Emerging Threats, Inca Digital
Southeast Asia Columnist, *The Diplomat Magazine*

Before the
HOUSE SELECT COMMITTEE ON
THE STRATEGIC COMPETITION BETWEEN
THE UNITED STATES AND THE CHINESE COMMUNIST PARTY

Hearing to Discuss Bipartisan Congressional Investigation:
Crime, Corruption, and Power:
CCP-Linked Transnational Criminal Organizations and the Rise of a Distributed Threat to U.S. National Security

May 19, 2026
United States Capitol Building
Washington, DC

# I. Introduction

Chairman Moolenaar, Ranking Member Khanna, and distinguished members of the Select Committee, thank you for the opportunity to testify at this hearing to discuss your newly released investigation, *Crime, Corruption, and Power*. By way of brief background, my work focuses on transnational crime and related security challenges in the Indo-Pacific. Across research, advisory, and policy roles, I help governmental and civil society partners understand how modern criminal networks become embedded in political systems and assess what kinds of responses are likely to be effective.

The Select Committee Report names a complex reality in which predominantly PRC-origin criminal networks, selective (albeit mounting) PRC enforcement efforts, state-adjacent legitimacy systems, illicit finance, instrumentalized private sector infrastructure, host-state corruption, human trafficking, cyber fraud, and geopolitical influence reinforce one another across borders.[1] While significant nuance is required given the array of contributing factors and underlying incentives, the Committee's broader characterization of this ecosystem as a "distributed threat" to U.S. and global security is apt and timely.

My testimony builds on that core framing by focusing on the specific case where this distributed threat has reached its most mature form. Cambodia is not merely a jurisdiction where PRC-origin criminal networks operate offshore. It is a political economy in which foreign criminal capital has been absorbed and converted into a source of elite rents and strategic leverage.[2]

That distinction matters for U.S. policy. Over the past decade, scam compounds, online gambling networks, casinos, real estate projects, payment systems, corporate shells, and coercive labor systems have fused with Cambodia's long-standing structures of authoritarian patronage and elite impunity into something more harmful than the sum of its parts.

The observable front end is Cambodia's archipelago of scam compounds, and that is where much of the international attention has concentrated up to this point. But the deeper structure is the protective political economy that: 1) allows those compounds to operate, 2) provides for the scaling and diversification of new criminal forms, and 3) allows criminal proceeds to be laundered – both via decentralized rails and a formal financial system with documented vulnerabilities and exposure to illicit finance.

In other words, the scam compound is where the harm becomes visible but the vertically integrated architecture behind it is what makes that harm durable and replicable at scale.

Cambodia should be understood not simply as a cybercrime hub, a trafficking destination, or a problematic partner state. Rather, it is an advanced case of criminal authoritarianism in the

---

[1] U.S. House Select Committee on the Chinese Communist Party, *Crime, Corruption, and Power: CCP-Linked Transnational Criminal Organizations and the Rise of a Distributed Threat to U.S. National Security* (Washington, DC: U.S. House of Representatives, May 2026).

[2] Jacob Sims, *Policies and Patterns: State-Abetted Transnational Crime in Cambodia as a Global Security Threat* (Humanity Research Consultancy, May 16, 2025), https://www.humanity-consultancy.com/publications/policies-and-patterns-state-abetted-transnational-crime-in-cambodia-as-a-global-security-threat.

digital era: a system in which illicit markets are not merely tolerated at the margins of governance, but become entangled with the incentives, survival strategies, and external alignments of the ruling political order. The result is a threat that directly harms people around the world through cyber-enabled fraud while also strengthening the very political conditions that make accountability difficult.[3]

## II. The Architecture of a Scam State

In forthcoming research supported by the National Democratic Institute and Inca Digital, I develop this argument through what I describe as "scam-state architecture."[4] I will not attempt to present the full version of that research here. Rather, this statement introduces the conceptual frame as a resource to clarify the stakes of the Cambodia case and why U.S. policy and enforcement must move beyond the visible compound layer to the political and financial architecture that upholds it.

The central claim is straightforward: Cambodia's scam economy is best understood as a layered system of modern state-crime convergence. It is decidedly not a weak state accidentally overrun by criminals, despite emphatic and recurring party-state protestations to the contrary.[5][6] Rather, it is a durable, elite patronage system that has learned over time, across multiple illicit and semi-licit economies, to absorb illicit capital.[7] The scam economy is the modern, digitally enabled manifestation of that older state formation.[8]

The resulting architecture has three layers.

The first is the **external capital and operational layer**. This includes both the PRC-origin criminal entrepreneurs and the online gambling and scam operators themselves as well as the payment and laundering systems, cryptocurrency infrastructure, real estate vehicles, and naturalization pathways through which high-risk foreign actors gained durable access to Cambodia. The Committee Report rightly identifies Chen Zhi as an archetype of this layer. Yet, Chen Zhi is also part of a much broader pattern of sophisticated actors entering Cambodia with criminal capital and capacity and building formal partnerships with party-state ultra elites.

The second is the **territorial protection layer**. This includes compound-owning oligarchs, casino and real estate operators, border-zone power brokers, private security structures, and local protection networks. These actors provide the land, facilities, coercive capacity, and operating environment in which scam compounds and forced-criminality operations can persist. The case

---

[3] United States Institute of Peace Senior Study Group, *Transnational Crime in Southeast Asia: A Growing Threat to Global Peace and Security* (Washington, DC: United States Institute of Peace, May 2024), https://www.usip.org/sites/default/files/2024-05/ssg_transnational-crime-southeast-asia.pdf.
[4] Jacob Sims, *Architecture of a Scam State* (Washington, DC: National Democratic Institute, forthcoming August 2026).
[5] Arthur Eremita, "Cambodian Propaganda: Playing the Victim to Get Away With Murder," *The Diplomat*, October 31, 2023. https://thediplomat.com/2023/10/cambodian-propaganda-playing-the-victim-to-get-away-with-murder/
[6] *The Wall Street Journal*, "Why Cambodia Became a Global Cybercrime Hub," April 19, 2026. https://www.wsj.com/world/asia/cambodia-cybercrime-rise-why-2f2c03cc
[7] Neil Loughlin, *The Politics of Coercion: State and Regime Making in Cambodia* (Ithaca, NY: Cornell University Press, 2024).
[8] Sims, *Policies and Patterns*.

of Ly Yong Phat, already subject to U.S. sanctions,[9] illustrates both the importance of this layer and the limits of episodic accountability when the deeper political core remains intact.[10]

The third and most pivotal layer is the **elite mediation layer**. This consists of politically connected Cambodian actors who provide access, legitimacy, regulatory insulation, and proximity to state power. While they may own compounds, these actors are not always the most visible compound operators. Their significance lies in their ability to make foreign capital bankable, governable, and politically useful inside the Cambodian system. This is the layer my testimony will examine most closely through the case of Hun To.

This architecture helps explain the central paradox of the last two years. From 2024 to 2026, Cambodia's scam economy faced unprecedented pressure: U.S. and allied sanctions, law-enforcement actions, Thai military incursions, Chinese interventions, public reporting, and growing FATF-related scrutiny.[11] That pressure frustrated parts of the system. It exposed major actors. It damaged reputations. It forced adaptation. But it has not yet meaningfully impacted the domestic kleptocratic core that made the system possible in the first place.[12]

# III. Layer One: Foreign Criminal Capital and Capacity

Chen Zhi is the clearest public example of the external capital layer in Cambodia's scam economy. The Committee Report already documents the basic trajectory: a Fujian-born, Cambodia-naturalized businessman with a history in online gaming and gambling fraud emerged in Cambodia as the founder of Prince Group. He rapidly obtained Cambodian citizenship and a diplomatic passport, became a cabinet-level adviser to both Hun Sen and Hun Manet, and built (in direct partnership with a Chinese SOE) one of the most visible real estate conglomerates in the country.[13] Early and sustained reporting by Radio Free Asia was pivotal in catalyzing international scrutiny into Prince Group's activities.[14]

U.S. and U.K. actions in 2025 targeted Prince Group through indictments, sanctions, and asset seizures, after which his continued protection became increasingly costly for both Phnom Penh and Beijing. As the Committee Report suggests, his eventual extradition to China should therefore not be understood as proof that the system self-corrected. It is better understood as evidence that even highly protected actors can become expendable within a scam-state architecture once international pressure crosses a certain threshold.[15]

But Chen Zhi should not be treated as an anomaly. He is merely the most visible expression of a broader incorporation pathway. The 2026 Kouprey/Mekong Independent naturalization dataset

---

[9] U.S. Department of the Treasury, "Treasury Sanctions Cambodian Tycoon and Businesses Linked to Human Trafficking and Forced Labor in Furtherance of Cyber and Virtual Currency Scams," press release, September 12, 2024, https://home.treasury.gov/news/press-releases/jy2576.
[10] Select Committee, *Crime, Corruption, and Power*.
[11] Jacob Sims, "Crackdown, Chaos, or Cover-Up in Cambodia?," *The Diplomat*, February 11, 2026, https://thediplomat.com/2026/02/crackdown-chaos-or-cover-up-in-cambodia/.
[12] Sims, *Architecture of a Scam State*.
[13] Select Committee, *Crime, Corruption, and Power*.
[14] Jack Adamović Davies, "Cambodia's Prince Group: A Business Empire Built on Crime?," *Radio Free Asia*, February 5, 2024, https://www.rfa.org/english/special-reports/prince-group/.
[15] Select Committee, *Crime, Corruption, and Power*.

found that more than 4,000 foreign nationals received Cambodian citizenship between 2000 and 2023, and that 56 percent of those naturalizations were granted to individuals originating from the People's Republic of China.[16] Prior analysis from the U.S. Institute of Peace suggested that surges in PRC-origin naturalizations beginning in 2013 tracked closely with major Chinese crackdowns on online gambling, telecom fraud, and capital flight.[17] As the Committee Report notes, this suggests that Cambodian citizenship became part of a broader geography of enforcement displacement.[18]

The corporate data sharpens the point. Risk intelligence firm Inca Digital cross-referenced the Kouprey dataset with Cambodia's Ministry of Commerce registry and found that the boards of nearly 6 percent of Cambodia's corporate universe had been penetrated by naturalized citizens, and that naturalized citizens who became directors held board seats at nearly triple the rate observed among native-born directors. Chen Zhi appears in 45 distinct corporate boards, alongside sanctioned individuals and senior Cambodian officials.[19]

The pattern is therefore larger than one man. High-risk foreign capital entered Cambodia, obtained legal durability through citizenship, entered corporate governance networks, and gained access to politically protected actors. Cambodia became attractive not merely as a site for criminal operations, but as a jurisdictional shelter for organized crime.

That local protection matters. PRC enforcement displacement and highly selective enforcement certainly helped shape the ecosystem. But they do not fully explain its durability. For that, the analysis must move inward: to the Cambodian elites who helped convert foreign criminal capital into landed and politically protected investment opportunities.

# IV. Layer Two: Oligarchic Territorial Protection

The second layer of the scam-state architecture is territorial protection. If Chen Zhi represents the imported criminal capital layer, Ly Yong Phat represents the "landlord-plus" archetype: the politically embedded oligarch whose value lies in land, compounds, casinos, local protection, and proximity to coercive power.

Treasury's 2024 sanctions against Ly Yong Phat and several associated businesses marked the first major U.S. move against a Cambodian political-economic elite tied directly to the ruling class for alleged involvement in trafficking-linked scam operations.[20] That action was important. It signaled that the United States was prepared to move beyond low-level operators and foreign criminal networks toward the party-state structures that make the industry possible.

---

[16] Kouprey, "Citizenship Inc.," *Kouprey Substack*, March 6, 2026, https://kouprey.substack.com/p/citizenship-inc; Mekong Independent, "Cambodian Citizenships Granted, 2000–2024," *Mekong Independent*, March 6, 2026, https://mekongindependent.com/2026/03/cambodian-citizenships-granted-2000-2024/.
[17] USIP Senior Study Group, *Transnational Crime in Southeast Asia*.
[18] Select Committee, *Crime, Corruption, and Power*.
[19] Inca Digital, *Citizenship, Criminal Infrastructure, and Foreign Leverage: Early Insights from Cambodia's Citizenship and Corporate Records* (Inca Digital, 2026), https://inca.digital/intelligence/cambodia-citizenship-data/.
[20] U.S. Department of the Treasury, "Treasury Sanctions Cambodian Tycoon and Businesses Linked to Human Trafficking and Forced Labor in Furtherance of Cyber and Virtual Currency Scams."

But the Ly Yong Phat case also shows the limits of episodic sanctions in a highly compromised environment. Sanctions can raise costs, delegitimize actors, disrupt access, and force reputational damage. They do not, however, by themselves, dismantle the protection system. In deeply criminalized autocracies, pressure often produces adaptation. Assets shift, corporate structures change or outright vanish from public registries, and proxies emerge.[21] This is precisely what appears to have happened in the aftermath of the Ly Yong Phat sanctions[22] and is the resilience pattern my forthcoming research examines more closely: effectively, how accountability pressure can disrupt operations while failing to meaningfully penetrate the architecture underneath them.[23]

The Ly Yong Phat case underscores another essential point: the evidence necessary to pursue serious accountability is generated by people under threat. Local journalists and civil-society actors played a critical role in documenting abuses tied to scam compounds, including in the Ly Yong Phat network.[24] One of Cambodia's most important investigative journalists, Mech Dara, was arrested just weeks after the U.S. sanctions were announced, an event widely viewed as part of a broader pressure campaign to stem the risk of international exposure.[25][26][27]

In contexts like Cambodia, independent journalists, survivor-support groups, and civil-society investigators are not peripheral actors. They are core accountability infrastructure. As they are silenced, the "distributed threat" becomes harder to see, harder to prove, and harder to disrupt.

# V. Layer Three: System-Level Elite Mediation

The deepest, most important layer in the scam-state architecture is likely not the foreign criminal entrepreneurs or even the compound-owning oligarchs. Rather, it is the politically protected mediation layer that connects foreign criminal capital to sovereign authority. Some mediators provide narrative cover: serving as public spokespeople,[28] bilateral cooperation interlocutors,[29] or aligned international voices[30] who help recast a criminalized political economy as ordinary. The

---

[21] Christian von Soest, "How Authoritarian Regimes Counter International Sanctions Pressure," *GIGA Working Papers*, no. 336 (2023): 11, https://hdl.handle.net/10419/276271.
[22] Coby Hobbs, "Firms Tied to US-Sanctioned Tycoon Ly Yong Phat Vanish," *CamboJA News*, December 24, 2024, https://cambojanews.com/firms-tied-to-us-sanctioned-tycoon-ly-yong-phat-vanish/.
[23] Sims, *Architecture of a Scam State*.
[24] VOD Staff, "Briefs: Regional Media Report More Scam Rescues," *VOD English*, October 24, 2022, https://vodenglish.news/briefs-regional-media-reports-more-scam-rescues/.
[25] Ross Holder, "Cambodia: Investigative Journalist Mech Dara Detained Amidst Growing Clampdown on Free Expression," PEN International, October 10, 2024, updated October 24, 2024. https://www.pen-international.org/news/cambodia-investigative-journalist-mech-dara-detained-amidst-growing-clampdown-on-free-expression
[26] Amnesty International, "Cambodia: Charges against Journalist Highlight Clampdown on Press Freedom," October 2, 2024. https://www.amnesty.org/en/latest/news/2024/10/cambodia-charges-against-journalist-highlight-clampdown-on-press-freedom/
[27] Human Rights Watch, "Cambodia: Investigative Journalist Arrested on Baseless Charge," October 3, 2024 https://www.hrw.org/news/2024/10/03/cambodia-investigative-journalist-arrested-baseless-charge
[28] Mech Dara, "With Banners and Publicity, Government Steps into Spotlight on Scams," *Mekong Independent*, February 26, 2026, https://mekongindependent.com/2026/02/with-banners-and-publicity-government-steps-into-spotlight-on-scams/.
[29] Men Kimseng, "FBI, Cambodia Ink Cooperation Agreement to Fight Transnational Crime," *VOA Khmer*, April 12, 2019, https://khmer.voanews.com/a/fbi-cambodia-ink-cooperation-agreemend-to-fight-transnational-crime/4873362.html.
[30] *The Morning Post*, "Wall Street Journal ណាបពណ៌កម្ពុជា…," Facebook video, May 2026, https://www.facebook.com/themorningposts/videos/959826786456148/.

most consequential mediators directly facilitate corporate access, financial system integration and regulatory protection via proximity and influence over formal state institutions.

Hun To, a nephew of former Prime Minister Hun Sen and cousin of Prime Minister Hun Manet, appears to sit close to the center of this mediation layer. Preliminary analysis of Kouprey's naturalization data and Cambodia's corporate records by Inca Digital identified Hun To as serving, or having served, on boards alongside naturalized citizens connected in public reporting, foreign court systems, and sanctions actions to Cambodia's scam industry and related criminal activity.[31] Inca's network graphic [reprinted with permission below] shows Hun To at the center of a corporate web linking him to Huione-related financial infrastructure, and an array of naturalized co-directors who are now subject to U.S. sanctions or foreign legal proceedings.[32]




Hun To's connection to Huione matters because it is not merely a peripheral financial actor. It has emerged as one of the most consequential illicit-finance ecosystems connected to the Southeast Asian scam economy. FinCEN identified Huione Group as a financial institution of primary money laundering concern in May 2025,[33] and later announced major action cutting Huione Group off from the U.S. financial system for laundering billions linked to DPRK cyber activity and Southeast Asian scam networks.[34] Huione Guarantee -- which rapidly reconstituted under different names after initial scrutiny[35] -- is described widely as the largest illicit online marketplace in history, with transaction volume tied to scam-enabling services, laundering,

---

[31] Inca Digital, *Citizenship, Criminal Infrastructure, and Foreign Leverage.*
[32] Ibid.
[33] Financial Crimes Enforcement Network, "FinCEN Finds Cambodia-Based Huione Group to Be of Primary Money Laundering Concern, Proposes a Rule to Combat Cyber Scams and Heists," press release, May 1, 2025 https://www.fincen.gov/news/news-releases/fincen-finds-cambodia-based-huione-group-be-primary-money-laundering-concern
[34] Financial Crimes Enforcement Network, "FinCEN Issues Final Rule Severing Huione Group from U.S. Financial System," press release, October 14, 2025. https://www.fincen.gov/news/news-releases/fincen-issues-final-rule-severing-huione-group-us-financial-system
[35] Matt Burgess and Lily Hay Newman, "Telegram Purged Chinese Crypto Scam Markets—Then Watched as They Rebuilt," WIRED, June 23, 2025, https://www.wired.com/story/telegram-purged-chinese-crypto-scam-markets-then-let-them-rebuild/

stolen data, and related criminal infrastructure in the tens of billions.[36] In other words, Huione is not simply adjacent to Cambodia's scam economy. It can be seen as a vital component of the financial architecture that helped make that economy scalable.

Hun To's documented proximity to that architecture is therefore highly significant. In addition to his board seat, corporate records (see Appendix A) indicate that Hun To held 300 shares in Huione Pay Plc, equal to a 30 percent ownership interest, making him the entity's second-largest shareholder after Li Xiong, who was arrested and extradited to China in late March 2026.[37] His ownership stake was first brought to broad international attention by Al Jazeera's *101 East* in an interview with Malaysian Prime Minister Anwar Ibrahim,[38] and Hun To has since publicly acknowledged the 30 percent stake while implausibly claiming he received no income from the enormously lucrative Huione ecosystem.[39]

The extant accountability gap is difficult to ignore. U.S. authorities have moved aggressively against Huione-related infrastructure.[40] Yet, as of this submission, Hun To does not appear to have faced comparable U.S. or allied action despite his documented ownership interest and broader corporate proximity to scam-linked networks. That gap illustrates the dynamic at the center of Cambodia's scam-state architecture, which I have discussed elsewhere: formal sovereignty and bilateral caution help insulate politically connected domestic actors even when the criminal-financial infrastructure around them becomes exposed.[41]

Notably, that insulating cycle has been further reinforced by legal pressure against those who report on him. Hun To has spent years pursuing defamation litigation in Australia against the journalists and media outlets that first linked him to cyber scam activity and other criminal allegations.[42] Whatever the formal posture of those cases, their broader effect is difficult to separate from the wider pattern of pressure facing journalists, researchers, and civil-society actors documenting Cambodia's scam economy. In this context, legal intimidation and transnational repression are not peripheral and should be viewed as security concerns given the nature of the evidence they seek to suppress.

If the United States and strategically aligned partners are serious about dismantling the architecture underpinning this "distributed threat," it cannot stop at foreign criminal entrepreneurs or compound landlords.

---

[36] Matt Burgess and Lily Hay Newman, "The 'Largest Illicit Online Marketplace' Ever Is Growing at an Alarming Rate, Report Says," *WIRED*, January 14, 2025. https://www.wired.com/story/the-largest-illicit-online-marketplace-ever-is-growing-at-an-alarming-rate/

[37] Sopheng Cheang, "Online Cyberscam Suspect Arrested in Cambodia Is Extradited to China," *Associated Press*, April 1, 2026. https://apnews.com/article/cambodia-china-scam-cybercrime-extradition-d3bb4f2cacda45204b35cfc8ac3d3681

[38] Al Jazeera, "Politics & Diplomacy: Exclusive Interview with Malaysia's Anwar Ibrahim," *101 East*, May 15, 2025 https://www.youtube.com/watch?v=H0B6FTJ83rc

[39] Seoung Nimol. "Hun To Admits Stake in Scam-Linked Huione Pay, Denies Involvement," *CamboJA News*, May 6, 2026. https://cambojanews.com/hun-to-admits-stake-in-scam-linked-huione-pay-denies-involvement/

[40] U.S. Department of the Treasury, "U.S. and U.K. Take Largest Action Ever Targeting Cybercriminal Networks in Southeast Asia" October 14, 2025. https://home.treasury.gov/news/press-releases/sb0278

[41] Sims, "Autocratic Leaders Are Using Sovereignty as a Shield." *The Diplomat.* May 30, 2025. https://thediplomat.com/2025/05/sovereignty-the-shield-and-sword-of-autocrats/

[42] Jack Adamović Davies, "Hun To Went After the Press; Who Really Won?," *Radio Free Asia*, July 19, 2024 https://www.rfa.org/english/news/cambodia/hun-to-the-australian-07192024162017.html

The case of Hun To raises harder questions: *who inside Cambodia facilitated system-level criminal access and protection? And, what actions can be taken to stem system-level impunity?*

# VI. Why These Questions Matter for U.S. National Security

I see three primary U.S. national (and global) security concerns emanating from digital-era criminal autocracy as presently manifested in Cambodia:

First, the direct financial and human harm is already severe. Treasury estimates that Americans lose more than $10 billion annually to Southeast Asia-based scam networks. Given pronounced under-reporting, actual losses are likely significantly higher. [43] Those losses often destroy retirement savings, home equity, and family assets, with lasting psychological harm to victims and their families.[44] This has all been fueled by the trafficking of hundreds of thousands of individuals into forced criminality - exploitation that will reverberate across a generation of vulnerable labor.[45][46]

Yet, the security significance extends beyond victim harm. In Cambodia, illicit proceeds generated through state-abetted scam networks and laundering infrastructure reinforce elite patronage corruption and deepen the regime's dependence on opaque, China-linked capital flows.[47] This reality fundamentally alters how the United States should understand strategic alignment. The Committee Report's discussion of Ream Naval Base is useful here. Focusing only on visible Chinese military access risks missing the deeper political economy that makes Cambodia's ruling elites receptive to malign influence and less responsive to U.S. pressure.

Finally, Cambodia is not only a case. It is a warning. The digital era criminal autocratic model is replicable: foreign criminal capital enters, gains legal durability through sovereign tools, embeds in pre-existing elite networks, captures or repurposes infrastructure, and adapts under pressure. If left unconstrained, this architecture will diffuse beyond Cambodia into other vulnerable jurisdictions and harms will continue to scale.

# VII. Policy Recommendations: Countering Scam States

A strategy aimed only at foreign criminal entrepreneurs misses the domestic ecosystem that makes the system durable. A strategy aimed only at scam compounds and the oligarch-like landlords behind them chases symptoms. U.S. policy should therefore focus on three pressure points:

---

[43] U.S. Department of the Treasury, "Treasury Sanctions Southeast Asian Networks Targeting Americans with Cyber Scams," press release, September 8, 2025. https://home.treasury.gov/news/press-releases/sb0237
[44] Select Committee, *Crime, Corruption, and Power*.
[45] Office of the United Nations High Commissioner for Human Rights, "Hundreds of Thousands Trafficked to Work as Online Scammers in SE Asia, Says UN Report," press release, August 29, 2023. https://www.ohchr.org/en/press-releases/2023/08/hundreds-thousands-trafficked-work-online-scammers-se-asia-says-un-report
[46] Amnesty International, *"I Was Someone Else's Property": Slavery, Human Trafficking and Torture in Cambodia's Scamming Compounds* (London: Amnesty International, 2025), https://www.amnesty.org/en/documents/asa23/9447/2025/en/.
[47] USIP Senior Study Group, *Transnational Crime in Southeast Asia*.

**1. Target the elite mediation layer through an allied accountability coalition.**
Congress should encourage Treasury, State, DOJ, and allied governments to prioritize constraining the politically protected mediators who connect foreign criminal capital to domestic sovereign protection. Particularly needed is an urgent review of available evidence concerning Hun To's corporate, ownership, and facilitation links to sanctioned scam-linked entities to determine whether sanctions, visa restrictions, law-enforcement action, or allied measures are warranted. This need not be a U.S.-only effort. Australia, the United Kingdom, Canada, the European Union, South Korea, Japan, Singapore, and victim-source countries all have direct interests in constraining Cambodia's scam-state architecture. Shared pressure also reduces Phnom Penh's ability to treat accountability as a bilateral irritant with Washington alone.

**2. Generate system-level financial friction.**
Individual designations matter, but scam-state systems adapt when the broader financial architecture remains permissive. As with earlier efforts to prevent narco-state dynamics from hardening into a globalized illicit system, the objective should be not only to constrain individual actors, but to raise the cost of the scam-state model before it becomes more widely replicable. While FATF grey-listing carries meaningful collateral risks, the pending mutual evaluation window presents a rare opportunity to impose sustained pressure on the financial, corporate, and regulatory channels that allow illicit proceeds to be laundered into protected political capital. Critically, this approach must extend beyond Cambodia to the professional services and wealth-management channels through which illicit actors seek legitimacy, including foreign family office vehicles,[48] discreet banking relationships, tax-efficient structures, and luxury-asset purchases in better-regulated financial centers.

**3. Protect evidence-generating civil society as core accountability infrastructure.**
In modern criminal autocracies, civil society is not merely a democracy-promotion concern. Cambodian journalists, frontline service providers, labor advocates, local investigators, and technical researchers have generated much of the evidence that made international action possible, often while facing intimidation, litigation, arrest, and narrowing civic space.[49] Persistent registry monitoring, corporate-network analysis, beneficial-ownership research, and high-fidelity survivor testimony collection inside a hostile operating environment have been central to accountability efforts to date. If those channels are further weakened or altogether shuttered, the architecture of protection will largely vanish from visibility and reach.

The strategic arc proposed here aligns closely with the *harm minimization* approach first advanced in my May 2025 study.[50] The international community should not continue to wait in suspended disbelief for near-term reform from a criminalized system whose harms now extend globally. Rather, the goal should be raising costs and preserving evidence channels -- making the scam-state model harder to finance, harder to protect, harder to legitimate, and harder to rebuild.

---

[48] Alleged Scam Kingpin's Singapore Family Office Chief Stole from Him," *Bloomberg*, November 6, 2025, https://www.bloomberg.com/news/articles/2025-11-06/alleged-scam-kingpin-s-singapore-family-office-chief-stole-from-him.
[49] Human Rights Watch, "Cambodia: Investigative Journalist Arrested on Baseless Charge," October 3, 2024, https://www.hrw.org/news/2024/10/03/cambodia-investigative-journalist-arrested-baseless-charge.
[50] Sims, *Policies and Patterns*.

Appendix

Seen and certified true copy
Date 18 / Apr / 2023
Signature

AVOCAT ATTORNEY AT LAW KINGDOM OF CAMBODIA

BUN SOVANN
Attorney-At-Law

## CHAPTER 2

## Capital – Shares

**Article 7: Capital – Shares**

The Capital of company is liable for 8,000,000 Riel (Eight thousand million Riel)(=2,000,000 USD, Rate: 4,000 Riel/USD); divided into 1,000 shares of which each share has a face value of 8,000,000 Riel (Eight million Riel).

The following shareholders contributed their shares in cash as follow:

1. Mr. Li Xiong 620 shares equal to the amount of 4,960,000,000 Riel equal to 62%
2. Mr. Hun To 300 shares equal to the amount of 2,400,000,000 Riel equal to 30%
3. Mr. Yan Sathya 80 shares equal to the amount of 640,000,000 Riel equal to 8%

**Article 8: Increase and decrease the capital**

A- The capital of company can be increased a time or more times by increasing of share as material, asset or monitory currency, by inputting of reserve asset. The increasing of the Capital is approved and authorized by the extraordinary general meeting of shareholders. The general meeting determines the new share terms and auditions and hand-over of the power to the governing board for decision.

B- The extraordinary general meeting can make a decision on decreasing the capital of the company by the procedure that can be made but shall not lower than the indication of the law.

**Article 9: Share contribution**

The contract of shareholding in currency cash value done in the period of establishing the capital of the company shall pay ¼ of the currency cash value of the share that signing the contract. The remaining of the share shall pay in additional by phase and by the condition determined by the Board of Director. The payment in the period of signing the contract for sharing shall be done at the company head office or at other place that determined.

The owner, transferee, executors and the signatory of sharing can be owned the amount of their shares by having the responsibility from the Board of Director.

**Article 10: Default of shares contribution**

If the shares contribution is not conducted and paid in full amount and the condition limited by governing board, the shareholder shall be added up to the interests for the days of delays. The proportional of the interests shall determine by the Board of Director.

*Translated in English*

Li Xiong